**UNITED STEELWORKERS OF AMERICA, AFL–CIO, Plaintiff,**

v.

**FERMET RECLAMATION, LTD., Defendant.**

No. 85 C 7466.

United States District Court, N.D. Illinois, E.D.

Jan. 24, 1986.

---

William H. Schmelling, Chicago, Ill., for plaintiff.

Edwin C. Thomas, John P. Morrison, Bell, Boyd & Lloyd, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

United Steelworkers of America, AFL–CIO ("Union") has sued Fermet Reclamation, Ltd. ("Fermet") to compel arbitration of two labor grievances under Labor Management Relations Act § 301, 29 U.S.C. § 185 ("Section 301"). Now both litigants have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Union's motion is granted and Fermet's is denied.

*Facts* [1]

In late May 1984 Fermet employee Jerry Simpson ("Simpson") underwent surgery at

---

1. Familiar Rule 56 principles impose on the party moving for summary judgment the bur-

a hospital in Joliet, Illinois. Though he had expected the cost of that surgery to be paid through Fermet's group health insurance plan, on June 21, 1984 [2] Fermet's insurance carrier wrote Simpson (Ex. I–1) [3] coverage had been denied.[4]

On July 16 Union filed a grievance with Fermet on Simpson's behalf, saying it was Fermet's responsibility under the Union-Fermet collective bargaining agreement (the "CBA") to provide Simpson with health insurance coverage. That grievance (the "Insurance Grievance") was filed on a printed "Grievance Report" form, signed by Simpson and two Union representatives (Ex. C). Fermet President Dennis Bloom ("Bloom") denied the Insurance Grievance that same day, using the "Answer of Company Representative" space provided on the back of the form (id.). No reason for the denial was specified.

On August 9 (24 days later) Union Sub-District Director Earl Schroeder ("Schroeder") wrote Bloom (Ex. D, emphasis in original):

As per the Labor Agreement between the parties, you are hereby notified that [Union] is appealing your answer on Jerry Simpson who was denied group insurance as per Agreement Article XIV, Section 1.

I would appreciate your calling me to set up a meeting on the above subject which has to be done in seven (7) days after your decision in step (b), unless a longer period is *mutually* agreed upon.

Bloom did not respond.

On either August 14 or 15 Simpson was cleared for return to work by his doctor. When he reported for duty, he claims Bloom told him "he would not be allowed to return to work until the insurance coverage disputes were resolved" (see Ex. J at 3).[5] Then on August 16 Bloom wrote Schroeder stating his "understanding that no contract exists with [Union]" (Ex. E) and:

Therefore, no terms or provisions of that document can have application.

Union next filed another grievance (the "Lockout Grievance") September 12 (Ex. F), protesting Simpson's having been "locked out" (not being allowed back to work). Five days later Bloom sent Union a denial of the Lockout Grievance (id.) as not having been filed within five days of the triggering event—Fermet's August 14 or 15 refusal to allow Simpson to return to work.[6]

---

den of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovant. *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984). Of course, the double perspective compelled by cross-motions for summary judgment has required each party to assert the lack of a genuine issue of material fact. And as the text discussion will reflect, though some factual differences do exist, no issue-determinative facts are in dispute.

2. For convenience, any future mention of a month and day alone, without specifying the year involved, refers to a date in 1984.

3. "Ex.—" citations refer to the exhibits verified by Union counsel William Schmelling ("Schmelling") and appended to Union's opening memorandum.

4. Ex. I–1 was addressed to Simpson in care of Fermet and bears a "June 25" receipt stamp. Union asserts (Union Stmt. Material Facts 4) Simpson was not shown the letter until July 15.

Fermet does not controvert that. Its submissions recite only the letter's date and when it was received at Fermet's offices (see Ans. 9–10; Fermet R. Mem. 3). Under this District Court's General Rule 12(f) Union's assertion is "deemed to be admitted."

5. That quoted language is taken from an April 5, 1985 letter from Schmelling to Fermet counsel Edwin Thomas ("Thomas"). Thomas' May 6, 1985 response (Ex. L at 1) "do[es] not deem it necessary to respond to each of [Schmelling's] factual statements," though Thomas then goes on to disclaim any admission of their accuracy. That disclaimer is echoed in Fermet R.Mem. at 5 n. 1. As n. 14 of this opinion reflects, the quoted unsworn version attributed to Simpson has not been accepted as true on the current motions.

6. For that purpose Bloom cited "Article 5 Section B"—an obvious reference to CBA Art. V, § 2(b). Bloom alternatively referred to the seven-day filing period established by CBA Art. V, § 2(c), though he did not explain how that section was relevant (as with the other provision, he simply cited it).

Schroeder then referred the matter to Union counsel Schmelling, who on October 24 wrote Bloom about his refusal to move further on the Insurance and Lockout Grievances, concluding (Ex. G):

> At your earliest convenience, please furnish me with a written explanation of your company's position with respect to these matters. Failure on your part to respond to this letter within two weeks of its receipt will leave the Union with little alternative but to initiate legal proceedings seeking to protect Mr. Simpson's contractual and statutory rights and to enforce the employer's bargaining obligation under the National Labor Relations Act.

That letter resulted in a November 15 meeting between Union and Fermet, attended by Schmelling, Schroeder, Bloom and Thomas. Some events of that meeting are disputed, but two matters are agreed-upon results of the meeting:

1. Fermet acknowledged the CBA was in effect.

2. Provision was made for Simpson to return to work (and he did so November 20 or 25).[7]

What the parties dispute is the bargaining stance Fermet took at the meeting: Bloom Aff. ¶ 16 says "we indicated that Fermet would not settle or arbitrate the [Insurance] grievance," while Schroeder says (Aff. ¶ 12):

> At the November 15, 1984 meeting, no demand for arbitration was made and none was rejected. The meeting ended on the understanding that both parties would attempt to check further into the facts surrounding Mr. Simpson's grievances in order to reach satisfactory settlement.

Thus Fermet R.Mem. 6 accurately characterizes as an "issue of fact":

> Whether on or before November 15, 1984 meeting between the parties and their counsel, Fermet "agreed to pursue further attempts to resolve" the July 15, 1984 grievance.[8]

However, as the later text discussion reflects, Fermet is wrong in labeling that issue "material"—for on the current motions it is *not* "outcome-determinative" (except in a sense the parties' submissions to this Court did not focus on at all [9]).

On March 25, 1985 Schmelling phoned Thomas to request arbitration of the grievances (Union R.Mem. 8). That request was followed up by an April 5, 1985 written demand for arbitration (Ex. J). Fermet's May 6, 1985 response (Ex. L) agreed to arbitrate a third grievance (arising out of Simpson's eventual discharge), but said as to the two involved here:

1. Fermet "maintains its refusal to arbitrate" the Insurance Grievance because:

> (a) Union had failed to comply with the CBA's timetable, and

> (b) as a substantive matter, the question whether Fermet had met its contractual obligation to provide health insurance was "simply not an arbitrable matter."

2. Though the Lockout Grievance was also not filed within the CBA-prescribed time period, Fermet would agree to arbitrate the timeliness question. But if Union should prevail as to timeliness, Fermet would insist the arbitration of the

---

7. Bloom Aff. ¶ 20 gives the November 20 date, while Schmelling's April 5, 1985 letter to Thomas (Ex. J at 3) gives November 25. Schroeder Aff. ¶ 13 puts the date "in late November." Nothing hangs on the difference.

8. It should be observed both litigants have been inattentive to the Rule 56(e) requirement that affidavits "shall set forth such facts as would be admissible in evidence": Both the Schroeder and the Bloom affidavits are conclusory rather than fact-testimonial in nature. But given the fact both parties have pursued the same course without objection, the situation is no different from a trial in which witnesses testify as to their conclusions regarding the effect of conversations (instead of properly telling who said what during the conversations), with no objections to the testimony being interposed by counsel. In that event the testimony is in evidence and may be considered.

9. That exception is discussed at the very end of the "Insurance Grievance" section of this opinion.

merits must proceed before another arbitrator.

There matters stood until Union filed this action August 26, 1985.

### CBA Provisions

CBA Art. V sets out the grievance procedure established by the parties (Ex. A at 4–5):

> When differences arise between the Company and the Union and/or employees covered by this Agreement as to the meaning and/or application of the provisions of this Agreement, such differences shall be settled in accordance with the following provisions:
>
> \*     \*     \*     \*     \*     \*
>
> SECTION 2.  (a) A complaint shall first be taken up by the aggrieved employee with the foreman directly in charge, either personally or through a Grievance Committeeman and an answer on the grievance shall be given to such aggrieved employee not later than the end of the next working day.
>
> (b) If the matter is not satisfactorily settled under step (a) the grievance shall be reduced to writing, signed by the aggrieved employee and a member of the Grievance Committee, and submitted to the management of the Company or a representative thereof within five (5) days after answer provided for in step (a).  The Company shall then provide a written answer to such aggrieved employee, the Union Grievance Committee and the United Steelworkers of America within five (5) work days, thereafter, unless a longer period is mutually agreed upon.
>
> (c) If the matter is not satisfactorily settled in step (b) the matter shall be taken up by the full Grievance Committee, a representative of the United Steelworkers of America, the aggrieved employee, and with management or with the representative thereof within seven (7) days after the decision in step (b), and an answer shall be given in writing within five (5) days thereafter, unless a longer period is mutually agreed upon.
>
> (d) If the matter is not settled to the satisfaction of the Union or the Company in the previous steps, it shall then be referred to an Arbitrator for final determination. . . .  The decision of the Arbitrator, when made in writing with the reasons assigned therefor, shall be final and binding on both parties and the parties hereto agree to abide thereby.  The expense of the arbitration, if any, shall be borne equally by both parties.  The Arbitrator shall have no power to add to, or to subtract from, or to modify any of the terms of this Agreement.

Art. V, § 5 (emphasis added) deals with the timeliness questions that form Fermet's main (though not sole) defense to this action:

> SECTION 5.  *Time Limit for Filing Grievances:* All grievances related to discharge, disciplinary actions, demotions and promotions, layoffs and recalls or other grievances in connection with the increase and decrease of the working force must be filed in writing within five (5) working days of the date of the cause of the grievance occurrence, and all other grievances must be filed in writing within fifteen (15) calendar days from the day the grievance occurred.  In the event a grievance is not filed within the above time limitations, or *in the event a grievance is filed and appeal is not taken in any of the steps of the grievance procedure set forth in this Article,* or if an appeal is filed and no answer made thereto within the time limitations therein specified, *the said grievance shall be deemed settled on the basis of the last answer or unanswered appeal, and the same subject matter shall not be considered or made the subject matter of any other grievance.*

### Insurance Grievance Analysis

■  At least from the time of the *Steelworkers Trilogy,*[10] and continuing through

---

**10.** *United Steelworkers of America v. American*  *Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4

last month's decision by our Court of Appeals in *Graphic Communications Union, Chicago Paper Handlers' & Electrotypers' Local No. 2 v. Chicago Tribune Co.,* 779 F.2d 13, 15–16 (7th Cir.1985), judicial deference to collective bargaining commitments to arbitration has been consistent and strong. As one of the *Trilogy (American Manufacturing,* 363 U.S. at 567–68, 80 S.Ct. at 1346) put it:

> The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator.

This is not to say, of course, that judicial abdication is called for by the mere presence of an arbitration clause. It remains necessary for the court to look at the scope of the arbitration provision and whether the issues in controversy come within that scope.

Thus Union and Fermet correctly agree the merits of the Insurance Grievance are irrelevant in a suit to compel arbitration. Though Fermet has asserted to Union it considers denial of the Insurance Grievance to have been substantively justified under the CBA, it does not press that argument here.

Instead Fermet's opposition to arbitration of the Insurance Grievance is principally grounded in the timing provisions of CBA Art. V.[11] Simpson and the Union representatives signed and submitted the Grievance Report form July 16. Whether that represented the Section 2(a)[12] or Section 2(b) step under the CBA is not really clear.[13] But in either event Fermet did precisely what the CBA requires: It answered the grievance (denying it the same day it was received) in the space marked "Answer of Company Representative."

Depending on whether the Grievance Report was a Section 2(a) or 2(b) step, Union then had five days (see Section 2(b)) or seven days (see Section 2(c)) to take the next grievance step, unless a longer period was mutually agreed upon. But Union's response did not come until August 9 (or 24 days later), when Schroeder wrote Bloom (Ex. D):

> [Union] is appealing your answer on Jerry Simpson.... That response reads in terms of taking the grievance process to the next step, which Schroeder at least *appears* to regard as "step (b)" (Section 2(b)). But whichever step it represented, Schroeder's response was not timely in CBA terms.

Fermet argues such untimeliness resulted in the Insurance Grievance being "deemed settled" in Section 5 terms on the basis of Fermet's denial. And if a grievance is "settled," Fermet says Section 2(d) —the arbitration clause—does not come

---

L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

**11.** Fermet also argues even if the Insurance Grievance is arbitrable in CBA terms, this Section 301 action is barred by the statute of limitations. That argument will be discussed below.

**12.** All further citations to CBA Art. V will simply take the form "Section—." Given the single-digit CBA references, there can be no confusion with citations to Section 301, or to Section 10(b) of the National Labor Relations Act.

**13.** Neither litigant has really dealt with this question. One clue might be whether the signing Union representatives were from its Grievance Committee (see Section 2(b)), but no designation of that kind was made on the form. Along the same lines, though the grievance does not show to whom it was delivered, the response was by Bloom (a top management person) rather than a foreman (compare Section 2(b) with Section 2(a)). Another clue—this one pointing to Section 2(a)—is that the Fermet answer occupies the first space of the form's reverse side, which also contains three more spaces labeled "Answer of Company next step." As the later text discussion reflects, Schroeder's August 9 letter (Ex. D), though not entirely clear, *seems* to treat Bloom's answer as one under Section 2(a) rather than 2(b).

into play at all, for that clause provides that only matters "not settled to the satisfaction of the Union or the Company in the previous steps" shall be referred to an arbitrator.

Of course it is certainly an odd locution, on the facts here, to speak of the Insurance Grievance as having been "settled to the satisfaction of the Union...." And it might perhaps be argued that the term "settled to the satisfaction" has a different meaning in Section 2(d)—which defines *arbitrability*—than the meaning of "deemed settled" in Section 5—which says only that the identical subject matter cannot be the predicate for a *new grievance.* If that were so—if Section 5 were literally limited to its label of "Time Limit for Filing Grievances"—Section 2(d) would not contain its own timetable for referring to arbitration a "matter ... not settled to the satisfaction of the Union or the Company." In that event, Fermet's contention based on timeliness might not be so clearly correct as it argues to be the case.

Indeed, a reading of the CBA as not rendering the Insurance Grievance "settled" in the sense now urged by Fermet is not so strained as it might seem at first blush. One month after Bloom had written "denied" on that grievance, and three weeks after Union had not triggered the next step in the grievance procedure—which Fermet *now* says "settled" the matter adversely to Simpson and Union for all purposes—Simpson claims Bloom spoke of the matter as not "resolved" (Ex. J at 3):

Upon being released from his physician to return to active employment on August 15, 1984, Mr. Simpson contacted Fermet. According to Mr. Simpson, President Bloom advised Simpson that he would not be allowed to return to work until the insurance coverage disputes were resolved.

If that were so,[14] it would seriously undercut the notion the grievance was "settled to the satisfaction of the Union [and] the Company."

But it is unnecessary to consider whether the CBA—hardly a model of draftsmanship—is susceptible to the possible construction outlined above. For purposes of this opinion it will rather be assumed that Fermet is right: that Union did not pursue all the grievance-to-arbitration steps in a timely manner, so as to permit invocation of the CBA's arbitration clause.

That pro-Fermet assumption can be made safely here, because Fermet cannot succeed in this case unless it also prevails on a corollary to that assumption. Fermet claims it agreed to submit grievances to arbitration only if the CBA's timetable were met. And that, it says, brings into play another facet of the *Trilogy (Warrior & Gulf,* 363 U.S. at 582, 80 S.Ct. at 1352):

[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.[15]

But on the facts tendered to this Court, Fermet is wrong on its corollary premise. First of all, at least in *substantive* terms the issue of arbitrability of the Insurance Grievance is for an arbitrator, not this Court (*Communication Workers of Amer-*

14. Because Ex. J (a letter from Union's lawyer) simply reports Simpson's version and no affidavit from Simpson has been tendered to this Court, Rule 56(e) precludes consideration of the hearsay statement. As the text reflects, this Court does *not* accept that statement as fact.

15. With all respect, that thin slice of *Warrior & Gulf* does not reflect its real flavor. Directly after the quoted language the Court went on to say (363 U.S. at 582–83, 80 S.Ct. at 1353, footnote omitted):

Yet, to be consistent with congressional policy in favor of settlement of disputes by the par-

ties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*ica v. Western Electric Co.*, 751 F.2d 203, 206 (7th Cir.1984)):

> The weight of the authority supports the rule that a court should compel arbitration of the arbitrability issue where the collective bargaining agreement contains a standard arbitration clause, the parties have not clearly excluded the arbitrability issue from arbitration, and deciding the issue would entangle the court in interpretation of substantive provisions of the collective bargaining agreement and thereby involve consideration of the merits of the dispute.

And second, on what might be termed the *procedural* aspect (timeliness) of the Insurance Grievance, it is plain that Union's noncompliance with the CBA timetable is not dispositive:

> 1. If Union's version of the facts were accepted, Fermet did not stand on that noncompliance, for it agreed nonetheless to treat the dispute as still open "in order to reach satisfactory settlement" (Schroeder Aff. ¶ 12), rather than taking the position it was already "settled" (CBA Section 5).
>
> 2. At worst, Bloom Aff. ¶ 16 matches up with Schroeder Aff. ¶ 12 to create a factual issue in that respect.[16]

In the posture of events just outlined, this second aspect of the question whether Fermet agreed to submit the Insurance Grievance to arbitration is also for an arbitrator and not for this Court.[17] Such is the plain teaching of *John Wiley & Sons v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), where a collective bargaining agreement established a three-step grievance process, with arbitration as the final step "in the event that the grievance shall not have been resolved or settled" in the prior step (*id.* at 556, 84 S.Ct. at 917). It was conceded the union had not pursued the first two steps, and the employer argued against an order to compel arbitration on the ground the procedural prerequisites had not been followed: That argument did not persuade the Court (*id.* at 556–58, 84 S.Ct. at 917–18):

> We think that labor disputes of the kind involved here cannot be broken down so easily into their "substantive" and "procedural" aspects. Questions concerning the procedural prerequisites to arbitration do not arise in a vacuum; they develop in the context of an actual dispute about the rights of the parties to the contract or those covered by it. In this case, for example, the Union argues that Wiley's consistent refusal to recognize the Union's representative status after the merger made it "utterly futile—and a little bit ridiculous to follow the grievance steps as set forth in the contract."[18]

\*     \*     \*     \*     \*     \*

**16.** This Court will not be called on to resolve that difference. Nonetheless it is worth noting parenthetically that Union's claim of Fermet's willingness to try to resolve the Insurance Grievance, even after its initial rejection, may be rendered more plausible by Fermet's acknowledged agreement—at the same November 15 meeting—to abandon its prior position (Ex. E) that there was no CBA for Union to invoke at all. It will be recalled Bloom had assigned no reason for his flat and immediate July 16 "Grievance Denied" answer to the same-day filing of the Insurance Grievance. It could well be reasoned by a factfinder that Bloom's action had in fact been predicated on Fermet's position (confirmed in his next communication to Union, his August 16 letter (Ex. E)) "that no contract exists with ... Union." And from that premise the factfinder could well also conclude that the November 15 negotiating meeting, which produced Fermet's agreement the CBA was in effect, also resulted in Fermet's conciliatory willingness to waive or ignore procedural arguments and consider the merits of the disputes.

**17.** Interestingly enough, as to the Lockout Grievance Fermet's lawyer has stated Fermet "will agree to arbitrate the question of timeliness in accordance with the authorities cited in [the Union lawyer's] letter" (Ex. L at 2)—and the principal among those authorities was *Communication Workers*. Moreover, Fermet's lawyer's stated refusal to arbitrate the Insurance Grievance was *not* at all due to any claimed nonarbitrability of the timeliness issue (which he labeled "a secondary issue at best," *id.*), but rather because of his substantive objections on the merits (which are of course not a defense to this action, even in Fermet's view).

**18.** [Footnote by this Court] That aspect of *Wiley* is not wholly mirrored in this case, although for several months Fermet (like the employer in

Once it is determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, "procedural" questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator. Even under a contrary rule, a court could deny arbitration only if it could confidently be said not only that a claim was strictly "procedural," and therefore within the purview of the court, but also that it should operate to bar arbitration altogether, and not merely limit or qualify an arbitral award. In view of the policies favoring arbitration and the parties' adoption of arbitration as the preferred means of settling disputes, such cases are likely to be rare indeed.

Thus it really does not matter whether the question of arbitrability vel non in light of the sequence of events is labeled as one of waiver, or of the purpose and effect of the possibly ambiguous "settled" language in the two CBA sections, or something else—nor does it matter whether the question, however labeled, is characterized as "substantive" or "procedural." What *does* control is that here, as in *Wiley*, the arguably "procedural" question—whether Union's failure to pursue the grievance timetable bars arbitrability in the factual context described in this opinion—surely "grow[s] out of the dispute and bear[s] on its final disposition." And *Wiley*'s lesson is that question "should be left to the arbitrator," just as the "substantive" questions of the grievance's merits should be left to the arbitrator if Union prevails on the first question.

That view of *Wiley* is strongly buttressed by a recent decision of our Court of Appeals (incidentally not cited by either party). *Beer, Soft Drink, Water, Fruit Juice, Carbonic Gas, Liquor Sales Drivers, Helpers, Inside Workers, Bottlers, Warehousemen, School, Sightseeing,*

*Charter Bus Drivers, General Promotional Employees of Affiliated Industries, Local Union No. 744 v. Metropolitan Distributors, Inc.*, 763 F.2d 300, 302 (7th Cir. 1985) read *Wiley* in the precise way suggested by this opinion:

> [O]nce a court determines that the parties to a collective bargaining agreement are obligated to submit the subject matter of their dispute to arbitration, then any procedural questions growing out of the dispute and bearing on its final disposition should be left to the arbitrator.

And *Metropolitan Distributors, id.* at 303 (footnote omitted) went on to apply *Wiley* in a way that might well have been written for this case:

> [W]e affirm the district court's conclusion that the union's alleged failure to submit its members' grievances within the time limitations specified in the collective bargaining agreement is an issue of procedural arbitrability which should be reserved for the arbitrator. Since it is clear that the parties are obligated to submit the subject matter of their dispute concerning severance pay to the arbitrator as provided in the collective bargaining agreement ... we conclude that under *Wiley* any procedural issues dealing with the timeliness of the union's filing of the grievances should be presented to the arbitrator.

Accord, *Local Union No. 51, International Brotherhood of Electrical Workers v. Illinois Power Co.*, 357 F.2d 916, 918–19 (7th Cir.), *cert. denied*, 385 U.S. 850, 87 S.Ct. 78, 17 L.Ed.2d 79 (1966) (question of union's waiver by delay in filing grievance is for arbitrator to decide), specifically relied on and followed in *Metropolitan Distributors*. That *Metropolitan Distributors-Illinois Power* conclusion should extend a fortiori to the type of issues posed by this case, where the "procedural" issue of timeliness is intertwined with the other

---

*Wiley* ) refused to acknowledge the effectiveness of the CBA. As to the latter stance, there is considerable irony (and inconsistency) in Fermet's having denied Union-advanced grievances because of the claimed non-existence of a contract, while it argues to this Court that Union

did not comply with the terms of that very contract. But even aside from that factor, the fact that *Wiley* and this case are not wholly parallel in factual terms is not significant, for the *legal* principle that informed *Wiley* is wholly applicable here.

already-identified factual issues and with their impact on arbitrability under the CBA.

Thus the presence of limited factual disputes between the parties does not foreclose summary judgment. Instead it points at most to the need for those disputes to be resolved by the arbitrator as factfinder. In Rule 56 terms the parties' factual differences are non-outcome-determinative. *Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160, 163 (7th Cir.1984). Union is entitled to summary judgment as to arbitrability of the Insurance Grievance (including the issue of its timeliness).

That conclusion requires consideration of Fermet's other challenge to the arbitrability of the Insurance Grievance: its assertion that *this* action was untimely filed. Two questions must be answered in that respect:

    1. What is the appropriate limitations period for Section 301 actions to compel arbitration?

    2. When did the statute begin to run?

■ As to the first question, Congress did not specify a limitations period for Section 301 actions. *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW), AFL–CIO v. Hoosier Cardinal Corp.,* 383 U.S. 696, 704–05, 86 S.Ct. 1107, 1113, 16 L.Ed.2d 192 (1966) therefore said:

> Accordingly, since no federal provision governs, we hold that the timeliness of a § 301 suit, such as the present one, is to be determined, as a matter of federal law, by reference to the appropriate state statute of limitations.

*Hoosier Cardinal* was (*id.* at 705 n. 7, 86 S.Ct. at 1113 n. 7):

> essentially an action for damages caused by an alleged breach of an employer's obligation embodied in a collective bargaining agreement. Such an action closely resembles an action for breach of contract cognizable at common law.

Though the Court thus "borrowed" a state limitations statute governing contract actions, it expressly reserved the question (*id.*):

> [w]hether other § 301 suits different from the present one might call for the application of other rules on timeliness....

Fifteen years after *Hoosier Cardinal,* the Court made it clear not every Section 301 suit characterized by the plaintiff as one for breach of a collective bargaining agreement would be governed by limitations applicable to breach-of-contract actions. In *United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981) a discharged employee had gone through arbitration, the result of which was to uphold his discharge. He then sued his union (alleging breach of the collective bargaining agreement) (*id.* at 58–59, 62, 101 S.Ct. at 1561–62, 1563). That lawsuit looked to the Court more like an action to vacate an arbitration award than an action for breach of contract, because the employee was trying to undo the unfavorable result of the arbitration process. Therefore the Court applied the state's 90-day limitations period for actions to vacate arbitration awards (*id.* at 64, 101 S.Ct. at 1564), noting also the federal policy favoring "relatively rapid disposition of labor disputes" (*id.* at 63, 101 S.Ct. at 1564, quoting *Hoosier Cardinal,* 383 U.S. at 707, 86 S.Ct. at 1114).

*Mitchell* must be perceived in light of its narrow grant of certiorari, limited to consideration of *which state statute* to apply (and consequently not whether federal labor policy might call for another approach) (*id.* at 60 n. 2, 101 S.Ct. at 1562 n. 2). Hence no attention was paid (save in the just-cited cautionary footnote) to the possibility that National Labor Relations Act § 10(b), 29 U.S.C. § 160(b) ("Section 10(b)") —a six-month limitations period for NLRB unfair-labor-practice suits—might better fill the bill. When that possibility was later posed in *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Court in fact considered and adopted the Section 10(b) standard.

Both *DelCostello* and *Mitchell* were "hybrid § 301/fair representation" cases (*DelCostello,* 462 U.S. at 165, 103 S.Ct. at 2291) in which a discharged employee challenged not only the employer's adverse action but also the adequacy of the union's prosecution of his grievance through contractual grievance processes. Fermet says Union's action here is not "hybrid"—involving no claim of Union misfeasance—so *DelCostello* is distinguishable.

That is to be sure a factual difference, but it misses (or distorts) the entire point of what is involved here. *Mitchell* was a case in which an employee had suffered an unfavorable arbitration award and wanted to get out from under its adverse impact. Not surprisingly the Court found that effort resembled—in state law terms—a suit to vacate an arbitration award (precisely what the employee wanted, though he sought other relief as well). Even though *DelCostello* partook of the same character, the Court—then having the Section 10(b) option before it—found the union's improper actions smacked most of an unfair labor practice, thus triggering the application of that limitations period. Section 10(b) was applied because of the parallel nature of the challenged conduct, *not* just because of the identity of the union as co-defendant.

What is the relevant analogy here? Surely a suit to force a party to live up to its promise to go to arbitration bears no real similarity to a post-arbitration lawsuit to enforce the arbitration award. Instead the defendant's claimed misconduct here has a double aspect:

1. As a broken promise, it is a garden-variety breach of contract.

2. As an employer's violation of a collective bargaining agreement, it carries at least the flavor of an unfair labor practice vis-a-vis the plaintiff union (see *DelCostello,* 462 U.S. at 170, 103 S.Ct. at 2293).

Because of the first resemblance, the claim might call for a conventional contract limitations period; because of the second, it might call for the Section 10(b) period. *Nothing* commends the third alternative urged by Fermet: the wholly non-parallel (and substantially abbreviated) vacation-of-arbitration-award limitations period.

In short, *Mitchell* is totally unpersuasive here as a precedent. And as between *Hoosier Cardinal* and *DelCostello,* the same reasoning that led the Supreme Court to its more recent choice of Section 10(b) as the closest analogy applies with equal force here. This Court will apply that six-month limitations period.[19] Accord, *Federation of Westinghouse Independent Salaried Unions v. Westinghouse Electric Corp.,* 736 F.2d 896, 899–901 (3d Cir.1984); *United Food & Commercial Workers International Union, AFL–CIO v. Cudahy Co.,* No. 84 C 1377, slip op. at 6–7 (N.D.Ill.1985); *Millmen's Union Local No. 1120 v. Pay Less Drug Stores Northwest, Inc.,* 589 F.Supp. 675, 676–78 (D.Ore.1984).

Because this action was brought August 26, 1985, it was timely filed if Union's cause of action arose on or after February 26, 1985. That date represents the watershed for Fermet's act of rejecting arbitration in a manner sufficiently unequivocal that Union knew or should have known of that decision.

■ That inquiry triggers the second hot dispute between the parties. Fermet says the triggering event came not later than Union's October 24 letter to Bloom, which said failure to receive a response to Union's demand for information within two weeks would (Ex. G):

leave the Union with little alternative but to initiate legal proceedings seeking ... to enforce the employer's bargaining obligation under the National Labor Relations Act.

But Fermet obviously prefers to ignore the fact there *was* a response to that letter: Fermet agreed to a meeting to discuss the Insurance Grievance, and that meeting was

---

**19.** If it did not, the even-longer contract-breach limitations period would represent the alternative choice.

held November 15. It is patent nonsense for Fermet to argue, as it does, that (Mem. 13):

> plaintiff was aware of defendant's unequivocal refusal to settle or arbitrate the grievance as of October 24....

Fermet's fallback position looks to the November 15 meeting itself as the date it made its bargaining stance unequivocal. Bloom Aff. ¶ 16 says he then "indicated that Fermet would not settle or arbitrate" the Insurance Grievance. But as already mentioned more than once in this opinion, that statement is directly contradicted by Schroeder Aff. ¶ 12, with its statement that both parties agreed "to check further into the facts ... in order to reach satisfactory settlement." Were the issue one for this Court to resolve, Schroeder's affidavit would foreclose summary judgment in Fermet's favor.

What is Union's version of the operative date? Union admits having demanded arbitration in the March 25, 1985 Schmelling-Thomas telephone conversation (Union R.Mem. 8). Were that (or, of course, the later date of Fermet's negative response to that demand) the critical event, this action would have been timely filed. But this time the Bloom affidavit blocks summary judgment on the statute of limitations issue in favor of Union.

Fortunately the earlier discussion of arbitrability also points the way toward solving the dilemma. In the course of resolving the previously-discussed factual issues, the arbitrator will perforce be called on to determine and make findings as to the factual issues that bear upon the timeliness of this action—most particularly what did or did not occur at the November 15 meeting. By contrast, the other possible alternative—that of a limited factual hearing by this Court on that score, to determine the timeliness of this action—would create the prospect of preempting the arbitrator's decision of facts that could control timeliness of the *grievance* (thus doing violence to the principles already discussed at length).

Accordingly the parties are ordered to arbitrate all factual issues posed by the Insurance Grievance, including the events of the November 15 meeting. If Union proves successful in the arbitration, its effort to enforce the arbitration award before this Court will enable both parties to address the limitations question—as to the original timeliness of this action—in light of the arbitrator's factual findings bearing on that question.

### Lockout Grievance Analysis

All the foregoing discussion as to arbitrability of the Insurance Grievance (except, of course, the just-completed discussion as to timeliness of this action) has equal impact on the Lockout Grievance as well. That alone would be dispositive as to that grievance. But there is another wholly-independent reason that leads to the same result of compelling arbitration of that grievance too.

Fermet has placed itself in an odd position over the Lockout Grievance. In the course of pre-litigation negotiations between the parties, Fermet initially argued the Lockout Grievance was untimely filed under Section 2(b). Then, in Thomas' May 6, 1985 letter to Schmelling (Ex. L at 2), Fermet agreed to arbitrate the question whether that grievance was timely filed, adding the proviso that if Union prevailed on that issue, arbitration of the merits would have to proceed before a second arbitrator.

Fermet adheres to that position before this Court. It insists it has agreed to arbitrate the Lockout Grievance, so relief from this Court is not required (more accurately, is not appropriate in case-or-controversy terms). Union argues that is not good enough: It points out there is no CBA provision for separating arbitration of procedural and substantive issues.

Fermet's proposition is an impermissible unilateral alteration of the CBA. Just as one party has no right to insist on a specific person to arbitrate grievances (see Section 2(d)), so there is no one-sided right to insist on more than one arbitrator per grievance. If Fermet did not respect the

impartiality of arbitration, it should not have agreed to that process when it signed the CBA. Clearly Fermet cannot have and eat its cake in the way it proposes.

Fermet has not taken the position that if it cannot have its two-step arbitration it will withdraw its consent to arbitrate. Nor has it argued in this Court any of its original grounds for opposing arbitration of the Lockout Grievance. But even if it did, it simply could not succeed in view of *Metropolitan Distributors* and the analysis in this opinion. Union's summary judgment motion must be granted as to the Lockout Grievance as well.

### Conclusion

There are no genuine issues of material fact, and Union is entitled to a judgment as a matter of law. Fermet's cross-motion for summary judgment is of course. denied. Fermet and Union are ordered to proceed forthwith to arbitration of the Insurance and Lockout Grievances in accordance with this opinion.