AM INTERNATIONAL LEASING
CORPORATION, Plaintiff,

v.

NATIONAL COUNCIL OF NEGRO
WOMEN, INC., Defendant.

No. 85 C 4780.

United States District Court,
N.D. Illinois, E.D.

Jan. 31, 1986.

Nathaniel Baccus III, Baccus, James &
Padgett, Washington, D.C., Ronald S. Sam-
uels, Washington, Kennon, Hunter & Sam-
uels, Chicago, Ill., for defendant.

Alan J. Lirtzman, Parker F. McMahan, Jr. & Assoc., Ltd., Chicago, Ill., for plaintiff.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

AM International Leasing Corporation ("Leasing") sues National Council of Negro Women, Inc. ("NCNW") to recover $87,324.93 in deficiencies on two defaulted office-equipment leases.[1] NCNW initially filed an alternative motion to dismiss or transfer. This Court's October 28, 1985 memorandum order (the "Order") denied that motion, rejecting all grounds asserted by NCNW and holding (Order at 1–2):

1. Venue was proper in the Northern District of Illinois because Leasing's principal place of business is here (see 28 U.S.C. § 1391(a)).

2. Nothing supported NCNW's contention that the choice-of-law provisions of the Lease Agreements—which deem each to have been made at Palatine, Illinois and choose Illinois law to govern the validity, performance and construction of the Agreements—were invalid contracts of adhesion or improper attempts to limit jurisdiction to a particular forum.

3. No adequate factual showing supported NCNW's request for transfer under 28 U.S.C. § 1404(a) ("Section 1404(a)").

4. NCNW's labeling of Shaw Industries, Inc. ("Shaw") as an indispensable party was "arrant nonsense."

■ NCNW now renews its motion,[2] reasserting as well the failure to join Shaw as an allegedly indispensable party. For the first time it also claims the absence of personal jurisdiction. For the reasons stated in this memorandum opinion and order, NCNW's renewed motion suffers the same fate as the original.

### Facts [3]

NCNW's national headquarters are in Alexandria, Virginia (Height 2d Aff. ¶ 1), and it is "either incorporated or registered to do business" in Washington, D.C., Virginia, New York, Georgia, California, Louisiana and Mississippi (id. ¶ 3). Some time before December 16, 1980 NCNW established an economic development project in Mississip-

---

1. Amended Complaint ("Complaint") Count 1 claims a deficiency of $8,348.31 on a December 16, 1980 lease agreement (the "1980 Lease Agreement"). Count II claims a deficiency of $78,976.62 on a December 26, 1981 lease agreement (the "1981 Lease Agreement").

2. NCNW's motion is captioned:

   DEFENDANT'S RENEWED MOTION TO DISMISS OR TO CHANGE VENUE OR IN THE ALTERNATIVE RULE 60(b)(6) MOTION FOR RELIEF FROM ORDER.

   Any such reference to Fed.R.Civ.P. ("Rule") 60(b)(6) is obviously inapt. There is no sense in which the Order was a "final order," the only type from which that Rule would be available to grant relief. See 7 *Moore's Federal Practice* ¶ 60.16[4] (1985).

3. For purposes of NCNW's Rule 12(b)(2) motion, Leasing's version of any disputed facts is to be credited, *Nelson v. Park Industries, Inc.*, 717 F.2d 1120, 1123 (7th Cir.1983), *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1277, 79 L.Ed.2d 682 (1984):

   To determine whether exercising personal jurisdiction is proper, a court may receive and weigh affidavits prior to trial on the merits. *O'Hare International Bank v. Hampton,* 437 F.2d 1173, 1176 (7th Cir.1971). During this preliminary proceeding, although the burden of proof rests on the party asserting jurisdiction, if the district court's decision is based on the submission of written materials the burden of proof is met by a prima facie showing that personal jurisdiction is conferred under the relevant jurisdictional statute. *Id.; see also Neiman v. Rudolf Wolff & Co.,* 619 F.2d 1189, 1190 (7th Cir.), *cert. denied,* 449 U.S. 920, 101 S.Ct. 319, 66 L.Ed.2d 148 (1980). Further, the party asserting jurisdiction is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record. *Id.*

   Here neither litigant has paid much attention to the distinction between an affidavit and a bald assertion of facts in the briefs, nor are the few submitted affidavits limited in scope to specific facts within the actual knowledge and competence of the affiants. But because neither party has offered objections to the present state of the record, this opinion will consider all facts—wherever presented—while following the *Nelson* admonition to resolve all squarely-presented factual disputes in Leasing's favor. See *United Steelworkers of America, AFL–CIO v. Fermet Reclamation, Ltd.,* 627 F.Supp. 1213, 1215 n. 8, (N.D.Ill. 1986).

pi (the "Factory Project"), funded by various federal agencies (Gavin Aff. ¶ 2). Staff for the Factory Project placed bid solicitations for office equipment (the "Equipment") in the Jackson, Mississippi daily newspaper (*id.* ¶¶ 3, 5). Among the published specifications was one obligating the bidders to provide financing for the Equipment (*id.* ¶ 6).

Two of the successful bids came from AM Varityper ("Varityper") and AM Multigraphics ("Multigraphics") (*id.* ¶¶ 7–8).[4] Details of the transactions were negotiated at meetings between Factory Project Director Vern Gavin ("Gavin") and local salespersons of Varityper and Multigraphics. All those meetings took place at NCNW's Mississippi factory (*id.* ¶ 9).[5]

Financing of the Equipment was accomplished via two 60-month Leases, the 1980 Lease Agreement (Ex. A) covering the Multigraphics items and the 1981 Lease Agreement (Ex. E) covering the Varityper items. In each instance the lessor was Leasing, not Varityper or Multigraphics. NCNW applied for the leases by mailing application forms to Leasing's Illinois offices for approval, and the Lease Agreements were approved and "executed" there (Fry Aff. ¶¶ 3–4).[6]

Forms related to the 1980 Lease Agreement listed, in handwriting or typewriting, the "Division" or "Sales Division" as Multigraphics, while the corresponding reference in the 1981 Lease Agreement and related documents was to Varityper (Exs. A, B, E, F; NCNW R.Mem.Ex. B at 5, 7). But as already stated, all forms used in connection with the transactions—including the Lease Agreements themselves—specifically identified the lessor as Leasing, headquartered in Palatine, Illinois. And each Lease Agreement further specified:

> 12. CHOICE OF LAW. This Lease shall be deemed to have been made in Palatine, Illinois regardless of the order in which the signatures of the parties shall be affixed, and the validity, performance and construction of this Lease shall be governed by the laws of the State of Illinois.

Once the Equipment was installed, payments were to be made to Leasing in Illinois as provided in each Lease Agreement (Exs. A, E):

> 2. LEASE TERM AND PAYMENTS.... Lessee agrees to pay to Lessor (at its principal place of business in Illinois) the total number of lease payments specified....

Whatever payments were made complied with that requirement (Fry Aff. ¶ 5).

NCNW fell behind in its payments, apparently because its federal funding dried up. Gavin "notified all of the companies with leases of this situation" (Gavin Aff. ¶ 13) and had "numerous telephone conversations" with Leasing during 1982 about "late rental payments and possible settlement of the dispute" (Leasing Mem. 4).[7] Leasing eventually repossessed the Equip-

---

**4.** Leasing identifies itself as a subsidiary of AM International, Inc. ("International") (Complaint preamble). Though the Complaint says nothing about Varityper or Multigraphics, Leasing Mem. 3 characterizes them as "divisions" of International (indicating they have no separate corporate existence).

**5.** Complaint Exhibits (hereafter cited "Ex.—"), including the Lease Agreements, appear to indicate Multigraphics' Jackson, Mississippi office and Varityper's Memphis, Tennessee office were involved in the negotiations (Exs. A, B, E and F).

**6.** In fact Ex. A, the photocopy of the 1980 Lease Agreement attached to the Complaint, is a counterpart that shows no execution by Leasing at all. Ex. E, the photocopy of the 1981 Lease Agreement, is signed by both Gavin and a Leas-

ing officer. Gavin's signature is dated "2/23/81," while the Leasing officer's signature is dated either "2–16–81" or "2–26–81." It is unclear whether the Fry Affidavit's statement as to the Lease Agreements being "executed" in Illinois (1) is simply a legal conclusion or (2) is based on the affixing of a Leasing officer's signature as the last act necessary to complete formation of the contracts (something not directly confirmed by the Exhibits) or (3) is a conclusion grounded on the parties' agreement in the choice-of-law provisions of the Lease Agreements.

**7.** NCNW does not actually deny the conversations took place, though its R.Mem. 5 refers to them as "alleged telephone calls."

ment and on January 11, 1983 wrote NCNW, to Gavin's attention, announcing a forthcoming sale of the Equipment. That sale took place two weeks later, leaving the deficiencies Leasing now seeks to recover.

■ Meanwhile, a year earlier, NCNW had sold the Factory Project's assets to Shaw, including (NCNW R.Mem.Ex. B at 1):

> all right, title and interest in and to any and all furniture, equipment, leases, deposits, contracts ... including but not limited to each and every item of equipment, furniture, lease as described on the copies of the leases, purchase agreements, furniture and equipment listing, attached hereto and incorporated herein by this reference.

Attached to the NCNW–Shaw agreement were some of the documents relating to the Lease Agreements (but not the Lease Agreements themselves), as well as a listing of all property to be transferred. That listing (NCNW R.Mem.Ex. B at 17, 19) clearly shows the "owner" of the Equipment as "AM Leasing, Inc." or "AM Leasing Corporation." [8]

Some time before Leasing foreclosed on the Equipment, Shaw attempted to negotiate assumption of NCNW's leases. However, no agreement was reached with Leasing (Fry Aff. ¶ 7).[9]

### Personal Jurisdiction

■ Illinois personal-jurisdiction law provides the analytical framework here, for as *Nelson*, 717 F.2d at 1123 put it:

> A federal court has personal jurisdiction over the parties in a diversity action only if a court in the state in which the federal court is sitting would have jurisdiction.

Since *Green v. Advance Ross Electronics Corp.*, 86 Ill.2d 431, 436–37, 56 Ill.Dec. 657, 660, 427 N.E.2d 1203, 1206 (1981) and *Cook Associates, Inc. v. Lexington United*

*Corp.*, 87 Ill.2d 190, 197–98, 57 Ill.Dec. 730, 733, 429 N.E.2d 847, 850 (1981), it is plain the test for personal jurisdiction in Illinois has two steps (see *State Security Insurance Co. v. Frank B. Hall & Co.*, 530 F.Supp. 94, 96–97 (N.D.Ill.1981)):

1. Courts must first look to Illinois' long-arm statute, Ill.Rev.Stat. ch. 110, ¶ 2–209 ("Section 2–209"), to determine whether it provides for jurisdiction. If the answer is no, the analysis is at an end.

2. Only if the statutory answer is affirmative must a court go on to consider whether assertion of personal jurisdiction in the particular case would violate the Due Process Clause under the "minimum contacts" test of *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) and its progeny.

Instead the parties have completely bypassed statutory analysis, focusing entirely on the constitutional question. Virtually all the cases cited in the briefs were decided before *Green* and *Cook Associates* (under the earlier regime of *Nelson v. Miller*, 11 Ill.2d 378, 389, 143 N.E.2d 673, 679 (1957), the scope of the long-arm statute had been thought coextensive with the reach of minimum-contacts analysis). See *Petty v. Cadwallader*, 135 Ill.App.3d 695, 697, 90 Ill.Dec. 518, 520, 482 N.E.2d 225, 227 (4th Dist.1985).

Section 2–209 provides in relevant part:

(a) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person ... to the jurisdiction of the courts of this State as to any cause of action arising from the doing of such acts:

---

8. Any such statements in the NCNW–Shaw agreement and its attachments satisfy the Fed.R. Evid. 801(d)(2)(A) definition of non-hearsay.

9. Fry Aff. ¶ 7 does not identify the person or persons at Shaw with whom negotiations took place. Gavin Aff. ¶ 13 says he "attempted to

purchase" the Equipment from Leasing, which refused to sell. But his affidavit is silent as to whether he was negotiating on Shaw's behalf or on behalf of NCNW. In any event, he is now "associated with" Shaw (NCNW R.Mem. 8).

(1) The transaction of any business within this State;

\*    \*    \*    \*    \*    \*

(c) Only causes of action arising from acts enumerated herein may be asserted against a defendant in an action in which jurisdiction over him or her is based upon this Section.

Thus the first question to be answered is whether the NCNW–Leasing transactions were "the transaction of any business within this State" by NCNW. That determination amounts to weighing "[a] wide variety of factors" (*First National Bank of Chicago v. Boelcskevy*, 126 Ill.App.3d 271, 274, 81 Ill.Dec. 380, 383, 466 N.E.2d 1182, 1185 (1st Dist.1984)) to arrive at what is more a factual finding than the fairness determination mandated by *International Shoe*. Nonetheless *Green* and *Cook Associates* are new enough so that courts must perforce rely to some extent on earlier decisions, at least as to the list of factors to be considered and the weight to be given them. See, e.g., *Boelcskevy*, 126 Ill.App.3d at 274–75, 81 Ill.Dec. at 383–84, 466 N.E.2d at 1185–86.

Here the parties dispute which of two cases, both dealing with non-Illinois-citizen defendants, this case resembles more closely: *O'Hare International Bank v. Hampton*, 437 F.2d 1173 (7th Cir.1971) (finding jurisdiction) or *Telco Leasing, Inc. v. Marshall County Hospital*, 586 F.2d 49 (7th Cir.1978) (finding no jurisdiction). In the best tradition of Edward Levi's *Introduction to Legal Reasoning*, a factual comparison of the two cases becomes profitable.

*O'Hare* presented the following factors (437 F.2d at 1175):

1. Defendant initiated lease negotiations by phoning the Illinois lessor's Chicago office.[10]

2. Defendant traveled to Illinois to negotiate part of the lease.[11]

3. Execution of the lease took place in Illinois (that is, the lessor was the last to sign).

4. Payments were to be sent to Illinois.

5. In addition to the lease, defendants furnished a guaranty, which provided it was to be construed according to Illinois law.

In *Telco* the factors were (586 F.2d at 51):

1. Defendant negotiated with two non-Illinois manufacturers to purchase equipment.

2. Those manufacturers had no organizational relationship to the Illinois lessor.

3. Contact with the lessor was initiated by the manufacturers and was directed to the lessor's agent in Texas.

4. That agent sent lease forms to defendants in Mississippi and directed they be returned to him, along with an initial payment, in Louisiana.

5. Defendant sent copies of the lease to the lessor in Illinois.

6. In the lease was a clause providing the lease was binding "when accepted by lessor in the State of Illinois."

7. There was also an Illinois choice-of-law clause.

8. For some two years thereafter, defendants communicated with lessor in Illinois by mail and telephone.[12]

In finding no personal jurisdiction, *Telco* distinguished *O'Hare* because the latter's out-of-state defendant initiated the whole lease transaction (586 F.2d at 52). In *Telco* the lease was a financing method arranged by a seller of goods on his own initiative. That distinction was also a major factor in *Northern Trust Co. v. Randolph C. Dillon, Inc.*, 558 F.Supp. 1118, 1120 (N.D.Ill. 1983), where the lease was also a form of financing arranged by an out-of-state seller for an out-of-state defendant, and the seller

---

**10.** Defendant denied making that call, but the court accepted plaintiff's version as true (see n. 3 of this opinion).

**11.** Defendant also denied the Illinois meeting.

**12.** Little weight was given that factor by the court, because plaintiff's allegation was made "broadly" and defendant claimed those communications were pursuant to efforts at settling the lessor-lessee lawsuit.

had no organizational relationship to the Illinois lessor.

Here the facts fall somewhere between *O'Hare* and *Telco-Dillon.* NCNW negotiated originally with agents of Varityper and Multigraphics who had no Illinois connections. But as NCNW frequently emphasizes in its submissions, its bids called for a package that included financing. It was obvious from the outset that if NCNW decided to accept the Varityper and Multigraphics bids, it was going to get financing through Leasing—unless of course it chose, despite its own bid specifications, to go elsewhere. And it was never a secret Leasing was in Illinois.

As this Court pointed out in the Order, in explaining why the choice-of-law clause was not a contract of adhesion (Order at 2 n. 1), the choice of financing was NCNW's, and the same must be said of the bids accepted. Financing was not negotiated by the seller after the deal was done. Instead NCNW advertised for an equipment-financing package, and that brought it directly into contact with Varityper, Multigraphics *and* Leasing. Further, though the agents of Varityper and Multigraphics doubtless set up NCNW's contact with Leasing, NCNW applied directly to Leasing's Illinois office to obtain the Lease Agreements. Those contacts were not initiated by Leasing. NCNW was free to look for its own source of financing or to accept that tendered by Varityper and Multigraphics—and it opted for the latter. See *Madison Consulting Group v. State of South Carolina,* 752 F.2d 1193, 1202–03 (7th Cir.1985) (emphasizing, under minimum-contacts analysis, the importance of the initiation-of-transaction factor).

Another element some courts have found persuasive is the choice-of-law provision. *Ronco, Inc. v. Plastics, Inc.,* 539 F.Supp. 391, 396 (N.D.Ill.1982) (citations omitted) observed:

[D]efendants transacted business in Illinois by voluntarily seeking the benefits and protections of Illinois law. The contract which defendants entered stated it would be governed by the law of Illinois. By choosing to apply Illinois law to this transaction, defendants sought to invoke the protections and benefits of the law of Illinois.... When a defendant voluntarily invokes the benefits and protections of Illinois law, he transacts business within the meaning of the statute.

Obviously, that factor alone did not persuade the *Telco* court. Indeed, there may be some unreality in saying the parties "chose" Illinois law when that choice is a form clause—but absent a finding of adhesion, that is a problem that runs all through the law of contracts, and there would be little left to the sanctity of contracts if courts were to label all such form provisions nonconsensual. In any event, the choice-of-law clause (though not decisive in itself) is one more arrow in Leasing's quiver.

Finally, NCNW's own behavior shows it was aware of its business obligations in Illinois. Its sale of assets to Shaw identified Leasing as the owner of the Equipment, not Varityper or Multigraphics.[13] NCNW's present attempt to claim ignorance of Leasing's role (R.Mem. 3) is simply lacking in candor.

Two factors remain to be considered: (1) payments to Leasing in Illinois and (2) communications from Gavin to Leasing in Illinois. Payment to the forum state was not enough in *Telco* or *Dillon,* but again, *no* one factor standing alone is enough. As for the phone calls, of course mere phone (or mail) communication with an Illinois plaintiff would not in itself be sufficient even to satisfy "minimum contacts," much less Section 2–209 (see *Lakeside Bridge & Steel Co. v. Mountain State Construction Co.,* 597 F.2d 596, 604 (7th Cir.1979)[14]).

---

**13.** True enough, Varityper and Multigraphics appear as "Divisions" or "Sales Divisions" on the Lease Agreements, but the lessor is plainly shown to be Leasing, and its location is specified as Illinois. And as the text reflects, NCNW plainly knew it.

**14.** Though *Lakeside's* total viability has been considerably impaired by such cases as *Afram*

But Gavin's calls assist in showing the relationship between NCNW and Leasing was direct and, in a business sense, personal. Gavin's attempts to extend payment terms under the Lease Agreement—attempts he initiated—help at least marginally to cement his contact with Illinois. See *Club Assistance Program, Inc. v. Zukerman,* 594 F.Supp. 341, 347 (N.D.Ill.1984) ("telephone calls between a plaintiff in Illinois and a defendant in another state satisfy the requirements of Section 2–209 if the defendant intends to affect Illinois interests and intends to communicate his message to Illinois").

NCNW points out one factor present in *O'Hare* was a visit by a defendant to Illinois to negotiate with the lessor. No such visit was made here. But *Telco* itself, on which NCNW most strongly relies, made nothing of that as a distinguishing factor: It pointed only to the question of who initiated the transaction (586 F.2d at 52). At least since *Pennoyer v. Neff,* 5 Otto (95 U.S.) 714, 24 L.Ed. 565 (1878) and its notions of physical power over a defendant ceased to mark the limits of personal jurisdiction, courts have never viewed physical presence in the state as a sine qua non of "the transaction of any business within this State."

In conclusion, it cannot be said under the present state of the law that any one of the many ingredients involved in the transaction of business across state lines is decisive for the existence of personal jurisdiction. Even Gulliver found himself bound in Lilliput by a plurality of finespun threads—and the ties that link NCNW to Illinois are far less tenuous, both individually and collectively. *Telco* itself teaches (586 F.2d at 52):

> [I]t is not the terms of the lease that are controlling, but all the facts and circumstances of the transaction, for it is from the total picture that we determine whether or not the exertion of jurisdiction would comport with the notions of fair play and substantial justice.

And the same "totality" approach applies to the more factual inquiry under Section 2–209. Here the total picture supports a conclusion NCNW transacted business in Illinois within the meaning of the statute.

It then becomes necessary in theory to consider the due process question. But the Illinois courts have consistently held Section 2–209 is, if anything, narrower in scope than the constitutional "minimum contacts" test, so that if the first is met, so is the second. That was in fact the principal lesson of *Green* and *Cook Associates.* See, e.g., *Petty,* 135 Ill.App.3d at 697, 90 Ill.Dec. at 520, 482 N.E.2d at 227.

In sum, the Rule 12(b)(2) portion of NCNW's motion to dismiss must be denied.[15] Only a brief discussion of the remaining aspects of its motion is needed.

*Transfer*

■ NCNW alternatively reasserts its motion to transfer this action to Mississippi [16] "[s]ince all testimony will come from persons in Mississippi" (Mem. 5). Though Section 1404(a) gives this Court broad discretion to transfer "[f]or the convenience of parties and witnesses, in the interest of justice," the picture NCNW paints is incomplete in terms of those criteria (even as to witnesses, the only factor NCNW really addresses at all).

---

*Export Corp. v. Metallurgiki Halyps, S.A.,* 772 F.2d 1358, 1364 (7th Cir.1985) and *Madison Consulting Group,* 752 F.2d at 1200, the limited proposition just stated in the text remains sound.

**15.** Leasing also asserts, as a ground supporting jurisdiction, the existence of an NCNW office at 407 South Dearborn Street, Chicago (Mem. 4). However, NCNW offers Height 2d Aff. ¶¶ 4–7 to show that office is apparently unconnected with NCNW's national operations. NCNW would know its offices better than Leasing, and in any event Leasing does not assert it has ever had any dealings with the Chicago office. In view of the conclusion already reached in the text, this Court need not address the effect Leasing's allegation would have on the jurisdictional question.

**16.** Though it does not specify the predicate for its motion to transfer, presumably NCNW seeks to invoke Section 1404(a). Neither party has cited statutes or applicable case law.

On that latter score, Leasing names (Lirtzman Aff. ¶ 2) three of *its* Illinois-based personnel whom it expects to call to testify as to the procurement of the leases and (especially) as to Leasing's version of NCNW's conduct leading to the defaults. In response NCNW names (Baccus Aff. ¶ 2), in addition to Gavin, three former Factory Project employees it says it may call. Two of those (Eugene Roland and Sharon Harris) currently reside in Mississippi, while the third, Brenda Wynn, lives in Nashville, Tennessee.[17]

Section 1404(a) requires a balancing of conveniences, and NCNW has the burden of showing that balance "weighs significantly in favor of transfer" (*Met-L-Wood Corp. v. SWS Industries, Inc.*, 594 F.Supp. 706, 710 (N.D.Ill.1984)). Leaving aside the witnesses' convenience for the moment, Leasing starts off with two "interest of justice" considerations on its side of the balance:

1. Leasing's choice of forum, although not so weighty a factor under the flexible Section 1404(a) as under the older doctrine of forum non conveniens (*Associated Mills, Inc. v. Rush Hampton Industries, Inc.*, 588 F.Supp. 1164, 1165–66 (N.D.Ill.1984)), is still one element in Leasing's favor (*Club Assistance Program, Inc. v. Zukerman*, 598 F.Supp. 734, 736 (N.D.Ill.1984)).

2. Almost certainly Illinois law will apply to resolution of the NCNW–Leasing dispute, as the Lease Agreements' choice-of-law provisions provide. Again in the interest of justice (*Letter-Rite, Inc. v. Computer Talk, Inc.*, 605 F.Supp. 717, 722 (N.D.Ill.1985), quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)):

> [I]t makes sense to hold the trial "in a forum that is at home with the state law that must govern the case."

As is almost always true, the "convenience of parties" consideration (in the narrow sense) is a standoff: Each litigant would prefer to do battle on its home turf. Thus NCNW's *only* real argument on its side concerns the convenience of its witnesses, who are no longer employed by NCNW and who—NCNW's R.Mem. 7 simply asserts—"will not agree to appear voluntarily." In sheer numbers, NCNW's four-to-three advantage in identified witnesses really amounts to a wash. But more importantly, neither NCNW's affidavit nor its briefs explain why most of its prospective witnesses are important to its case. From the facts stated, there is no suggestion NCNW intends to challenge the validity of the Lease Agreements, at least on grounds of fraud or duress or some other theory to which testimony concerning the negotiation process would be relevant. In fact NCNW made payments on the Lease Agreements until—it appears—its money ran out. Both it and Shaw used the Equipment until Leasing repossessed it as a result of the default in payments. Thus the principal factual inquiry would seem to center around the Gavin-Leasing attempts to address NCNW's financial problems. If any of NCNW's proposed witnesses (except Gavin himself) has anything to say about *that*, this Court has received no factual support to put on the scales.

Even as between the witnesses NCNW says it will need and those Leasing says it will need, then, NCNW appears to have the worse of it. Surely it has offered nothing meaningful to override the factors favoring Leasing for Section 1404(a) purposes. NCNW's motion to transfer is again denied.

### Shaw as an Indispensable Party

■ Finally, NCNW (presumably seeking a Rule 12(b)(7) dismissal) again labels Shaw an indispensable party. That argument gains nothing in the repetition. Leasing sues NCNW on their written Lease Agreement. Leasing had no agreement with Shaw. If it has some different cause of action against Shaw, it is not forced to

---

17. This Court can only speculate whether a Nashville resident would find it more inconvenient to attend a trial in Chicago or Mississippi.

link that claim with its breach-of-contract action against NCNW.

True, NCNW transferred its *rights* under the Leases to Shaw, but it is well established a party can only transfer its *liabilities* when the creditor (Leasing) consents. See 4 *Corbin on Contracts* § 866 (1951); 3 *Williston on Contracts* § 411 (3d ed. 1960). Here Leasing stoutly refused to assent to the NCNW–Shaw assignment (let alone to an attornment that would release NCNW), and thus NCNW is still fully on the hook to Leasing. NCNW's potential rights as against Shaw are of no relevance here. Shaw is not a party indispensable to the full adjudication of rights as between NCNW and Leasing, nor would recovery by Leasing subject NCNW to multiple liability (see Rule 19(a)). That final element of NCNW's motion is therefore denied.

### Conclusion

None of the arguments for dismissal or transfer presented by NCNW has merit, and its renewed motion is therefore denied in full. NCNW is ordered to answer the Complaint on or before February 7, 1986.